IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-01508-PSF-PAC

KAY PERSICHITTE,

      Plaintiff,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTHERN COLORADO,

      Defendant.

---

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. # 51), filed October 4, 2006. Plaintiff filed a Response (Dkt. # 61) on November 9, 2006, and defendant filed its Reply (Dkt. # 70) on December 1, 2006. Having reviewed the parties' arguments, the record, and the applicable law, the Court enters the following Order.

## I. BACKGROUND

The following facts are either undisputed or viewed in the light most favorable to plaintiff, the non-movant. Defendant, the Board of Trustees of the University of Northern Colorado ("UNC"), hired Plaintiff Dr. Kay Persichitte in approximately August 1994 as an Assistant Professor. Final Pretrial Order (Dkt. # 49), ¶ 4(a), at 4. She was promoted to Associate Professor in 1998 and became Chair of the Educational Technology ("Ed Tech") Department in 1999. *Id.* at ¶¶ 4(c), 4(d). The previous

Department Chair was Edward Caffarella, who had been Dr. Persichitte's academic advisor and doctoral dissertation advisor when she was a graduate student at UNC. *Id.* at ¶ 4(e); Persichitte Depo., Ex. A to Def. S.J. Br. (Dkt. # 52), at 28. Eugene Sheehan has been Dean of the College of Education since August 2000 and supervises the Ed Tech Department in that capacity. Sheehan Aff., Ex. D to Def. S.J. Br., at ¶ 3. Dr. Jeffrey Bauer was an Associate Professor who served as interim Department Chair for the 1998-1999 academic year until Dr. Persichitte was appointed. Bauer Aff., Ex. E to Def. S.J. Br., at ¶ 3. Dr. James Gall was hired by UNC as an Assistant Professor in the Ed Tech Department in 1998; he was promoted to Associate Professor and granted tenure in 2005. Gall Aff., Ex. F to Def. S.J. Br., at ¶ 3. Dr. Linda Lohr started as an Assistant Professor in the Ed Tech Department in 1997 and was promoted to Associate Professor in 2003. Lohr Aff., Ex. G to Def. S.J. Br., at ¶ 3. She also succeeded Dr. Persichitte as Department Chair in 2003. *Id.* at ¶ 9.

Between 1994 and 1999, the work environment in the Ed Tech Department was collaborative and positive. The faculty members regularly socialized with each other outside of work. Ex. A to Def. S.J. Br., at 12. The first incident that Dr. Persichitte considered to constitute sex discrimination occurred in the fall of 2000, when Dr. Gall referred to Dr. Persichitte as Dr. Caffarella's "protégé" during a department meeting and abruptly ended the meeting. *Id.* at 35-36, 48. In other department meetings during the 2000-2001 academic year, Dr. Bauer and/or Dr. Gall made comments that "it was hard working for or working in a department where there were girls that were

2

overachievers." *Id.* at 36, 43.  There were "additional incidents" of anger and hostility

exhibited by Dr. Gall and Dr. Bauer toward Dr. Persichitte at department meetings,

leading Dr. Persichitte to complain to Dean Sheehan that "the department meetings are

deteriorating" and that the behavior of Dr. Gall and Dr. Bauer was "at the very least,

unprofessional, and at its worst, it's just plain rude and uncalled for." *Id.* at 43;

Persichitte Aff., Ex. 2 to Pl. S.J. Resp. Br. (Dkt. # 62), at ¶ 4.  She also told Dean

Sheehan during the fall of 2000 that she felt such behavior would not have occurred "if

I were a man or if Ed Caffarella were still in this job," although she did not tell him at

that time that she thought she was being harassed.  Ex. A to Def. S.J. Br., at 49.  Dean

Sheehan told Dr. Persichitte that he would have a discussion with Dr. Bauer and Dr.

Gall.  *Id.* at 43.

Dr. Persichitte was on sabbatical during the 2001-2002 academic year and

returned in the summer of 2002.  *Id.* at 51-52.  In the fall of 2002, Dr. Gall and/or Dr.

Bauer "lost their tempers again" in at least two department meetings.  *Id.* at 52.  Dr.

Persichitte recalls the anger being related to her role as Department Chair and Dr.

Gall's perception that she was "making up the rules as [she] went."  *Id.* at 58.

After Dr. Caffarella retired at the end of 2002, the situation continued to

deteriorate.  In February 2003, Dr. Gall sent an e-mail to Dr. Bauer and Dr. Lohr

complaining about Dr. Persichitte and encouraging them not to support her promotion

to full professor.  Ex. 5 to Pl. S.J. Resp. Br.  Dr. Gall continued to complain about Dr.

Persichitte throughout the spring of 2003:

3

!        In March 2003 Dr. Gall sent an e-mail to Dean Sheehan accusing Dr. Persichitte
         of making departmental decisions without faculty input, failing to keep the faculty
         informed, and attempting to "micro-manage" the department.  *Id.* at Ex. 9.

!        In April 2003 Dr. Gall sent Dr. Persichitte an e-mail accusing her of harassing his
         graduate assistant, interfering with management of the computer lab, interfering
         with the administration of "comps" (doctoral exams), and using her master key to
         rifle through his office.  He also encouraged her to step down as department
         chair and seek professional help, and wrote that he would "not continue in the
         role of your whipping boy" and that "[t]his crap really needs to stop."  *Id.* at Ex.
         10.

!        A week later Dr. Gall complained to Dean Sheehan that he was unhappy with his
         faculty evaluation by Dr. Persichitte, accusing her of including errors,
         exaggerations, and "outright lies."  Ex. 11 to Pl. S.J. Resp. Br.  Dean Sheehan
         supported Dr. Persichitte's evaluation.  *Id.* at Ex. 2, ¶ 17.

!        Dr. Gall also complained to Dean Sheehan that Dr. Persichitte had made the
         summer 2003 teaching assignments without following proper procedure.  Dean
         Sheehan responded that teaching assignments were within Dr. Persichitte's
         authority as Department Chair.  Ex. D to Def. S.J. Br., at ¶ 8.

         The conflict between Dr. Persichitte and Dr. Gall intensified when Dr. Persichitte

succeeded Dr. Caffarella in January 2003 in administering a federal U.S. Department of

Education ("DOE") grant entitled "Preparing Tomorrow's Teachers to use Technology"

(the "PT3 grant").  Dr. Gall became concerned about Dr. Persichitte's administration of

the grant because he felt that she had become secretive, resisted questions about the

grant, and "there was an overall feeling that she held all the cards."  Ex. F to Def. S.J.

Br., at ¶ 7.  Dr. Persichitte maintains that she "provided ALL information as requested

by anyone" and "responded to every question about departmental operations."  Ex. 2 to

Pl. S.J. Resp. Br., at ¶ 9.

On May 15, 2003, Dr. Gall filed a complaint with the General Accounting Office ("GAO") regarding Dr. Persichitte's administration of the PT3 grant.  Ex. F. to Def. S.J. Br., at ¶ 9.  He also sent memos to other faculty members alleging several instances of unethical behavior by Dr. Persichitte and warning them that Dr. Persichitte had a master key to the offices and would be "willing to invade our privacy."  Exs. 18 & 19 to Pl. S.J. Resp. Br.  In addition, he formally requested from Dr. Persichitte via the Ed Tech listserv, "[o]n behalf of the faculty and students" of the Ed Tech Department, a full accounting of the PT3 grant for the 2002-2003 fiscal year.  *Id.* at Ex. 15.  On May 20, 2003, Dr. Persichitte submitted her letter of resignation to Dean Sheehan, effective August 9, 2003.  Ex. M to Def. S.J. Br.  Her letter indicated that she had accepted a position at the University of Wyoming.  *Id.*

During the fall and spring of 2003, Dr. Persichitte informed Dean Sheehan that the professional attacks on her were escalating, the allegations of wrongdoing and ethical violations were getting out of control, and she was spending an inordinate amount of time responding to threats to expose unlawful behavior and financial mismanagement.  Ex. A to Def. S.J. Br., at 67-69.  She also complained that Dr. Gall had put his allegations against her of fiscal misconduct, ethical improprieties, unfair treatment of faculty, and misuse of PT3 grant funds in writing and continued to pursue them in a public setting rather than in an internal and discrete manner.  *Id.* at 79; Ex. 2 to Pl. S.J. Resp. Br., at ¶ 18.  She told Dean Sheehan on "multiple occasions in 2003" that the level of harassment had become intolerable and that "they would never treat

Ed Caffarella this way because he is a man." Ex. 2 to Pl. S.J. Resp. Br., at ¶ 21. Dean

Sheehan repeatedly advised her not to engage with Dr. Gall and to channel any

responses through him (the Dean) so that he was "aware of status." *Id.* at ¶ 19.

In June 2003, Dr. Gall refiled his GAO complaint with the Department of

Education's ("DOE") Inspector General after being informed that he should make any

complaints about the PT3 grant to the funding agency. Ex. 14 to Pl. S.J. Resp. Br., at

1. The complaint included allegations that Dr. Persichitte and Dr. Ferguson-Pabst,

another faculty member, would be using grant money to attend a conference in Hawaii

in June that students had described as a "lush, tax-payer funded junket." *Id.* at 2. The

DOE informed Dr. Gall that they would not investigate the matter absent some

involvement of a political figure or the media. Ex. F to Def. S.J. Br., at ¶ 9. Apparently,

based on that alleged representation, Dr. Gall called Fox News and spoke to a reporter

about the upcoming conference. *Id.* at ¶ 10. Dr. Gall did not inform anyone in the

department or UNC administration regarding his intent to contact Fox News. *Id.* at

¶ 16.

Fox hired a private investigator to follow Drs. Persichitte and Ferguson-Pabst in

Hawaii and at a conference in Seattle immediately following the Hawaii trip. On July 3,

2003, Fox News sent an Open Records Act request to UNC regarding the Hawaii and

Seattle trips. Ex. O to Def. S.J. Br. On July 20, 21, and 22, 2003, Fox News broadcast

a three-night investigative report on the trips. Dean Sheehan was in South Africa when

the story aired. His opinion was that, because Dr. Persichitte had resigned, UNC

6

should "just move on from the embarrassment the story created."  Ex. D to Def. S.J. Br.,

at ¶ 13.  When he returned, he called the Dean of Education at the University of

Wyoming, where Dr. Persichitte would be employed in the fall of 2003, and told her that

Dr. Persichitte was a good worker, person and chair, that he considered the Fox News

story to be an aberration, and that he thought "they" should hire her.  *Id.* at ¶ 14.

     In July 2003, Dr. Gall created a website that contained a link to the stories and

information relating to his complaint to the DOE about Dr. Persichitte.  Ex. F to Def. S.J.

Br., at ¶ 11.  Dr. Gall owned the domain for the site and did not discuss the creation or

operation of the site with anyone in the department or UNC administration.  *Id.*  The site

referred readers with questions about the site to Dr. Gall's UNC e-mail address.  Ex. 27

to Pl. S.J. Resp. Br.  UNC Counsel Ronald Lambden learned in January 2005 about the

site's existence and its listing of Dr. Gall's university e-mail address.  Lambden Aff., Ex.

Y to Def. S.J. Reply (Dkt. # 70), at ¶ 3.  He informed Dean Sheehan and instructed Dr.

Gall on January 19, 2005 to remove the reference to his UNC e-mail address from the

site.  *Id.* at ¶ 4.

     On July 18, 2003, Dr. Gall circulated a report he had created to the Ed Tech

Faculty, Dean Sheehan, and Provost Allen Huang.  The report discussed the DOE

complaint he had filed, accused Dr. Persichitte of harassing him for questioning her

about the PT3 grant, and accused her of various other ethical improprieties and

financial mismanagement.  Ex. 21 to Pl. S.J. Resp. Br.  On July 30, 2003, Dr. Gall sent

a message to the Ed Tech listserv in which he referred to Dr. Persichitte's "lawlessness

and unethical behavior" and her alleged violation of various university policies.  *Id.* at Ex. 22.

On November 19, 2003, the Greeley Tribune published a story about UNC's change in travel policy "after a Denver news station followed two UNC faculty on a federally funded trip to Hawaii . . . and documented their minimal participation in a conference."  Ex. S to Def. S.J. Br.  The story did not mention Dr. Persichitte by name.

In the spring of 2004, Dr. Gall filed a complaint with the Association for Educational Communication and Technology ("AECT"), which included the same accusations he had filed with the DOE.  Ex. F to Def. S.J. Br., at ¶ 12.  He did not inform anyone in the department or UNC administration regarding his intent to file the complaint.  *Id.* at ¶ 16.  When Dean Sheehan learned of the complaint, he telephoned AECT and said that believed the complaint was not valid and should be abandoned. *Id.* at Ex. D, ¶ 15.  Dr. Gall later withdrew the complaint.  *Id.* at Ex. F, ¶ 12.  There were no findings of any wrongdoing on Dr. Persichitte's part.  *Id.* at Ex. A, 179.

Another issue arose in the spring of 2004 regarding the annual conference for Professors of Instructional Design and Technology ("PIDT").  UNC had hosted the conference at YMCA of the Rockies in Estes Park in 1999, 2001, and 2003, and at the end of the 2003 conference Dr. Persichitte put a deposit on the facility to reserve it for use in 2005.  Ex. U to Def. S.J. Br.  In March 2004, Dr. Persichitte gave the YMCA her home mailing address in response to a request for her contact information to send a copy of the deposit confirmation.  *Id.*; Ex. T to Def. S.J. Br.  UNC concluded that UNC

8

funds had been used for the reservation and requested reimbursement from Dr. Persichitte. *Id.* at Ex. T. However, Dr. Persichitte explained in an e-mail that the deposit came from a separate PIDT account that was in the control of the department. *Id.* at Ex. U. Dr. Gall then sent an e-mail to Dr. Lohr, copying Dr. Persichitte's new dean and department head at the University of Wyoming, accusing Dr. Persichitte of "improperly mov[ing] department funds and PT3 funds" into the PIDT fund and attempting to hide it from the faculty. *Id.* at Ex. V. Dr. Gall had not informed anyone in the department or UNC administration about his intent to send the e-mail. *Id.* at Ex. F, ¶ 16. When Dean Sheehan learned of the e-mail, he chastised Dr. Gall for sending it to Dr. Persichitte's dean and department head. *Id.* at ¶ 15.

As a result of the e-mail, Dr. Persichitte's dean at the University of Wyoming contacted the university's lawyer to see if there were any implications for the school. Ex. A to Def. S.J. Br., at 171. Her department head asked if there was anything he needed to know, she explained that she had done nothing wrong, and that was the last she heard about it from either one. *Id.* at 171-73. However, according to Dr. Persichitte some of her new colleagues at the University of Wyoming "continue to monitor [her] with suspicion." Ex. 2 to Pl. S.J. Resp. Br., at ¶ 43. UNC has never made a public statement absolving Dr. Persichitte. *Id.* at ¶ 44.

After filing a charge of sex discrimination with the EEOC on September 10, 2004 (Ex. W to Def. S.J. Br.) and receiving notice of her right to sue, Dr. Persichitte filed a lawsuit against UNC for sex discrimination and retaliation under Title VII of the Civil

9

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* UNC filed a Motion to Dismiss (Dkt. #

14) pursuant to F.R.Civ.P. 12(b)(6) on January 31, 2006. On September 27, 2006, the

Court entered an Order (Dkt. # 47) granting in part and denying in part UNC's motion.

The court dismissed plaintiff's discrimination claim, holding that (1) her claims as to

adverse employment actions occurring before November 14, 2003 were time-barred

because they occurred more than 300 days before the filing of her EEOC charge, and

(2) because all of the alleged adverse employment actions that were not time-barred

occurred after she had resigned from UNC, plaintiff had failed to state a claim for

discrimination under Title VII. However, the Court denied defendant's motion to

dismiss as to plaintiff's retaliation claim, holding that her status as a former employee

did not preclude her from bringing a retaliation claim for acts that occurred on or after

November 14, 2003. The Court also noted that acts allegedly occurring prior to

November 14, 2003 could potentially constitute relevant background evidence in

support of her timely claim. Order at 13.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under F.R.Civ.P. 56(c) "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986). When applying this standard, a court reviews the

pleadings and the documentary evidence in the light most favorable to the nonmoving

party.  *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).  To

defeat a properly supported motion for summary judgment, "there must be evidence on

which the jury could reasonably find for the" nonmoving party.  *Panis v. Mission Hills*

*Bank*, *N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In addition,

"'where the non moving party will bear the burden of proof at trial on a dispositive issue'

that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make

a showing sufficient to establish the existence of an element essential to that party's

case' in order to survive summary judgment."  *McKnight v. Kimberly Clark Corp.*, 149

F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).  The content or

substance of the evidence presented at the summary judgment stage must be

admissible.  *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).

## III.  ANALYSIS

### A.  Title VII Retaliation Framework

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that

(1) she engaged in protected opposition to discrimination, (2) a reasonable employee

would have found the challenged action materially adverse, and (3) a causal

connection existed between the protected activity and the materially adverse action.

*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)

(citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006)).  If

the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to set

11

forth a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant

satisfies its burden, it then shifts back to the plaintiff to show that the proffered

explanation is a pretext for retaliation. *Id.* at 1202-03.

### B. Plaintiff's Retaliation Claim

#### 1. Evidence of statutorily protected conduct

Plaintiff must first establish that she engaged in protected opposition to

discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996).  The

Tenth Circuit has held that informal complaints to superiors can constitute protected

opposition; thus, filing a formal complaint or charge is not required. *Hertz v. Luzenac*

*Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).  In addition, a plaintiff need not

demonstrate that the defendant "actually discriminated against him; [s]he need only

show that when [s]he engaged in protected opposition, [s]he had a reasonable good-

faith belief that the opposed behavior was discriminatory." *Id.* at 1015-16.

Defendant contends that none of the things plaintiff identified during her

deposition as the perceived catalysts for retaliation—her non-complimentary

evaluations of Dr. Gall, her continuing to print agendas, have faculty meetings, and

conduct the department as she saw appropriate, her not allowing Dr. Gall to use

department funds to attend a PIDT conference, and the dean's decision that she could

travel—constitute protected activity under Title VII. Def. S.J. Br. at 19-20.  Defendant

further argues that, although plaintiff knew UNC had a non-discrimination policy, she

never filed a claim and never spoke to an Equal Opportunity or Affirmative Action

12

officer.  *Id.* at 20.  She also never included a reference to sex discrimination or hostile work environment in Dr. Gall's or Dr. Bauer's evaluations.  *Id.*  With regard to plaintiff's complaints to Dean Sheehan, defendant asserts that they referred to behavior that simply did not constitute sex discrimination or harassment.  Rather, plaintiff's complaints were about "rude" and "unprofessional" behavior in department meetings; Dr. Gall's anger about issues related to her role as Department Chair; and Dr. Gall's continued and public professional attacks accusing her of legal and ethical violations, fiscal misconduct, and unfair treatment of faculty.  *Id.* at 20-21.

Plaintiff responds that she made informal complaints to Dean Sheehan about Dr. Gall's and Dr. Bauer's allegedly gender-biased behavior; that she sent at least one e-mail to Dean Sheehan in May or June of 2003 saying that she was "convinced that this harassment is only happening because I am a female, and that if I were a male in this position, it would not be happening"; that from 2000 to 2003 she spoke informally about "behaviors she considered gender-biased" in department meetings and other settings to Kay Ferrell (a professor in a different department), Linda Lohr, Donna Pabst (an adjunct professor), and Janet Hill (a professor at the University of Georgia and former assistant professor at UNC); and that she repeatedly complained verbally to Dean Sheehan in the spring of 2003 about the behavior of Dr. Bauer and Dr. Gall, using the word "harassment" to describe how they were treating her.[1]  Pl. S.J. Resp. Br. at 23-25.

_____

[1] Plaintiff also asserts in an affidavit attached to her summary judgment response brief that she made informal complaints to Provost Marlene Strathe about the gender-biased behavior and that, during the summer of 2003 while Dean Sheehan was in Africa, she told unidentified men in "the upper administration of UNC" that she was being attacked and harassed for being a woman in a position of

Viewing the evidence in the light most favorable to plaintiff, there is a genuine issue of material fact as to whether she engaged in protected opposition to discrimination.  As discussed above, plaintiff's failure to file a formal complaint is immaterial to this issue; rather, informal complaints to superiors are sufficient.  *Hertz*, 370 F.3d at 1015.  And although many, and indeed most, of plaintiff's complaints to Dean Sheehan do not involve claimed attacks on plaintiff based on her sex, a few of them do.  Specifically, in the fall of 2000, she complained to Dean Sheehan about Dr. Gall's and Dr. Bauer's treatment of her in department meetings, stating that she felt such behavior would not have occurred "if I were a man or if Ed Caffarella were still in this job."  Persichitte depo., Ex. A to Def. S.J. Br., at 49.  Similarly, she testified that she told Dean Sheehan on "multiple occasions in 2003" that the level of harassment against her had become intolerable and that "they would never treat Ed Caffarella this way because he is a man." Ex. 2 to Pl. S.J. Resp. Br., at ¶ 21   Finally, she testified that she e-mailed Dean Sheehan in the summer of 2003 stating that she was convinced the harassment was only happening because she was female.  Ex. A to Def. S.J. Br., at

authority and for having outworked the men in the department.  Ex. 3 to Pl. S.J. Resp. Br., at ¶ 7.  This assertion is in direct conflict with her deposition testimony, in which she did not list Provost Strathe or any men in UNC administration other than Dean Sheehan in response to defense counsel's request that she list every person to whom she ever complained about sex discrimination.  Persichitte depo., Ex. X to Def. S.J. Reply, at 109-10.  An affidavit that conflicts with prior sworn statements may be disregarded if it appears to constitute an attempt to create a sham fact issue.  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.  *Id.*  Applying those factors here, the Court concludes that the statements in plaintiff's affidavit regarding her complaints to Provost Strathe and men in UNC's upper administration constitute an attempt to create a sham fact issue.  Accordingly, those statements are disregarded.

14

119-20.  Thus, there is some evidence that Dr. Persichitte informally complained to her superior, Dean Sheehan, that she was being harassed because of her sex.  There is also evidence that she arguably had a reasonable, good-faith belief that the opposed behavior was discriminatory.  *Id.* at 48, 52, 119.  Accordingly, defendant is not entitled to summary judgment on this element.

### 2.  Evidence of material adverse action

Plaintiff must next demonstrate that a reasonable employee would have found the challenged action by defendant materially adverse.  The Supreme Court made clear in *Burlington* that viable retaliation claims are "not limited to discriminatory actions that affect the terms and conditions of employment," and that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  126 S.Ct. at 2412-13.  Rather, in the context of retaliation a challenged action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2415 (citations omitted).  The Court explained that "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Id.*  In addition, the "reasonable employee" requirement ensures that the standard for judging harm will be objective and that the particular circumstances surrounding the act will be taken into consideration.  *Id.*

Plaintiff presents evidence of four challenged actions that occurred on or after November 14, 2003, and that accordingly may be considered in evaluating plaintiff's

claim.[2]  First, plaintiff complains of the November 2003 Greeley Tribune article reporting that UNC had changed its travel policy "after a Denver news station followed two UNC faculty on a federally funded trip to Hawaii during the summer and documented their minimal participation in the conference. . . . [¶] Publicity from the two professors who traveled to Hawaii caused embarrassment for the university and raised suspicion from the state auditor's office."  Ex. S to Def. S.J. Br.  The university employees quoted in the article did not comment on the reason for the change, and plaintiff was not mentioned.  There is also no indication that the story was published at the behest of UNC or any of its employees, including Dr. Gall.  The benign comments by the employees quoted in the article do not constitute materially adverse action such that a reasonable employee would have been dissuaded from making a discrimination claim.

Second, plaintiff complains about the April 2004 e-mails Dr. Gall copied to her new dean and department head at the University of Wyoming accusing her of "improperly mov[ing] department funds and PT3 funds" into the PIDT fund and attempting to hide it from the faculty, and noting that Dr. Gall had initiated an AECT ethics inquiry.  Ex. V to Def. S.J. Br.  Defendant argues that the only consequences of

---

[2] Plaintiff also discusses a fifth challenged action, Dr. Gall's presentation of the Fox News tapes to one of his classes in November 2005.  However, this occurred over a year after she filed her Charge of Discrimination on September 10, 2004, and over a month after she filed her Amended Complaint in this case.  Thus, the incident is not referenced in either filing.  Accordingly, plaintiff has failed to exhaust her administrative remedies with regard to the incident, and thus the Court will not consider it.  *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1238 (10th Cir. 2004) (noting that "each discrete retaliatory action constitutes its own 'unlawful employment practice for which administrative remedies must be exhausted'") (citations omitted).

16

the e-mail were that the dean contacted the university's lawyer to discuss implications

for the university, and the department head asked plaintiff if there was anything he

needed to know.  When plaintiff assured him she had done nothing wrong, she heard

nothing more about it.  Def. S.J. Br. at 24.  However, this ignores plaintiff's testimony

that some of her new colleagues at the University of Wyoming "continue to monitor

[her] with suspicion."  Ex. 2 to Pl. S.J. Resp. Br., at ¶ 43.  In addition, defendant's

argument ignores the standard set forth in *Burlington* regarding what constitutes a

materially adverse action.  The adverse consequences need not affect the terms,

conditions, or privileges of employment or future employment opportunities, as

defendant contends.  *Burlington*, 126 S.Ct. at 2413.  This challenged action, copying a

new employer on an e-mail accusing plaintiff of federal grant mismanagement and

discussing the initiation of an ethics inquiry, is materially adverse under *Burlington*.

The threat that one's new employer would be contacted and given such information

could well dissuade a reasonable employee from bringing a discrimination claim.

Third, plaintiff complains of the April 2004 AECT complaint filed by Dr. Gall.

Defendant again argues that, because the complaint was withdrawn and the charges

dismissed, there were no adverse consequences affecting the terms, conditions, or

privileges of employment or future employment opportunities.  Def. S.J. Br. at 24-25.

Again, this ignores the *Burlington* standard.  A plaintiff's knowledge that a professional

ethics complaint would be filed against her for bringing a discrimination claim might

17

dissuade a reasonable employee from bringing that claim and thus could constitute a materially adverse action.

Fourth, plaintiff complains about Dr. Gall's personal website on which he provided information about his complaints to the government about plaintiff and the results of the Fox News investigation.  According to plaintiff, the information about her on the website is "defamatory and untrue."  Pl. S.J. Resp. Br. at 32.  Again, viewing the facts in the light most favorable to plaintiff, the threat that such a website would be created and maintained might dissuade a reasonable employee from bringing a discrimination claim.

For the foregoing reasons, there is a genuine issue of material fact as to the second element of plaintiff's retaliation claim—whether a reasonable employee would have found the challenged action materially adverse.  Accordingly, summary judgment is not appropriate on this ground.

### 3.  Evidence of causal connection

Under the third element of a retaliation claim, plaintiff must show that a causal connection existed between the protected activity and the materially adverse action. *Argo*, 452 F.3d at 1202.  Absent additional evidence, an inference of retaliatory motive can be made only if there is a close temporal proximity between the protected activity and the adverse action.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).  "[U]nless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal

proximity to establish causation." *Id.* (emphasis in original); *compare Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation), *with Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period, standing alone, is insufficient to establish causation).

In this case, viewing the facts in the light most favorable to plaintiff, the most recent occurrence of protected opposition to discrimination occurred in May or June of 2003, when plaintiff e-mailed Dean Sheehan complaining that the harassment by Dr. Gall was only happening because she was female.  This was five months before the story appeared in the Greeley article, which the Court has already held did not constitute a materially adverse action as a matter of law, and ten months before the filing of the AECT complaint and the e-mail to plaintiff's new dean and department head in April 2004.  Even if plaintiff engaged in protected conduct until her resignation was effective in August 2003, that occurred three months before the article and eight months before the AECT and e-mail issues.  Thus, because of the temporal gap between the protected activity and the challenged action, plaintiff must provide additional evidence to establish causation.  *Anderson*, 181 F.3d at 1179.  This the plaintiff has failed to do.

There is simply no evidence in the record to support a causal connection between the challenged actions cited above and plaintiff's protected activity, namely, her complaints to Dean Sheehan, her superior, that she was being harassed because

of her gender.  Indeed, the evidence suggests numerous other reasons for Dr. Gall's actions, such as plaintiff's negative evaluation of him, his impression (regardless of how inaccurate) that she made departmental decisions without faculty input and micro-managed the department, interfered with his management of the computer lab, and gave teaching assignments without following proper procedure.

Plaintiff argues that she continued to contact defendant asking for support when the challenged actions occurred.  For example, she e-mailed Dean Sheehan after the article was published to again proclaim that she had done nothing wrong and to note how hard it was "to escape the umbrella of suspicion" when such articles came out.  Ex. 31 to Pl. S.J. Resp. Br.  Plaintiff's continued complaints to Dean Sheehan, however, were unrelated to any behavior toward her because of her gender.  Rather, they related to the attacks on her credibility and accusations of unethical behavior and financial mismanagement.  Thus, they did not constitute opposition to prohibited discrimination.

Without producing any specific evidence tying together plaintiff's protected activity and the adverse actions, plaintiff has failed to raise a genuine issue of material fact on the causation element of her retaliation claim.  Accordingly, defendant's motion for summary judgment is granted on that ground.

### 4.  Evidence of intentional retaliation and non-retaliatory reasons

Defendant also contends that it is entitled to summary judgment because plaintiff cannot demonstrate that the challenged actions constituted intentional retaliation by her former employer, UNC.  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253,

1265 (10th Cir. 1998) (holding that, because harassment must be intentional on the part of the employer, an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions). In addition, defendant claims there were legitimate, non-retaliatory reasons for the actions. However, because defendants are entitled to summary judgment on causation grounds, the Court does not reach these arguments.

## IV. CONCLUSION

For the reasons set forth above, this Court GRANTS defendant's motion for summary judgment and orders that plaintiff's complaint be dismissed with prejudice. The Final Trial Preparation Conference, set for Friday, January 26, 2007, and the jury trial, scheduled to commence Monday, February 5, 2007, are hereby VACATED.

DATED: January 25, 2007

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Court Judge